USDC-SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC#:
DATE FILED: 09/29/2017

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

CYNTHIA CUMMINGS, RAGLAN
GEORGE, JR., BETTY POWELL,
CAROLYN COX, LUZ SANTIAGO, GINA
RUSCH, ANDRE LAKE, and CYNTHIA
MCCRIGHT, *as Trustees of the District
Council 1707, Local 95 Head Start
Employees Welfare Fund,*

Plaintiffs,

v.

THE CITY OF NEW YORK and THE NEW
YORK CITY ADMINISTRATION FOR
CHILDREN'S SERVICES, RONALD E.
RICHTER, COMMISSIONER,

Defendants.

No. 13-CV-1303 (RA)

OPINION & ORDER

RONNIE ABRAMS, United States District Judge:

Plaintiffs are the Trustees of the District Council 1707, Local 95 Head Start Employees Welfare Fund (the "Local 95 Fund" or the "Fund"), a multiemployer plan within the meaning of the Employee Retirement Income Security Act of 1974 ("ERISA"). Plaintiffs allege that Defendants, the City of New York and the New York City Administration for Children's Services ("ACS"), failed to make approximately $15 million in contributions to the Fund between 2009 and 2012. They assert a claim under Section 515 of ERISA as well as various state law claims. Defendants, who now move for summary judgment, argue that they were not obligated to make the contributions at issue. Because the Court agrees with Defendants that they are entitled to judgment as a matter of law on all claims, Defendants' motion is granted.

Head Start is a federal program that makes grants to local governments and non-profit organizations for the purpose of providing child development services to economically disadvantaged children and families. Defs.' 56.1 ¶ 3, ECF No. 75; Pls.' 56.1 ¶ 3, ECF No. 92. The City of New York has operated a Head Start program since the 1960s, Defs.' 56.1 ¶ 4; Pls.' 56.1 ¶ 4, and ACS has administered the program since 1997, Defs.' 56.1 ¶ 5; Pls.' 56.1 ¶ 5.[2] The program is funded at least in part by federal grants. *See* Defs.' 56.1 ¶ 6; Pls.' 56.1 ¶ 6. ACS does not provide Head Start services directly; instead, it contracts with non-profit organizations (the "Delegate Agencies") to provide the services. Defs.' 56.1 ¶ 8; Pls.' 56.1 ¶ 8.

The Fund was formed on September 13, 1994 pursuant to an Agreement and Declaration of Trust (the "Trust Agreement") between District Council 1707, Head Start Local 95, Community and Social Agency Employees Union, AFSCME, AFL-CIO ("Local 95"), the New York City Head Start Sponsoring Board Council (the "HSSBC"), and various trustees. Kane Decl. Ex. 15 ("Trust Agreement"), ECF No. 79; *see also* Defs.' 56.1 ¶ 28; Pls.' 56.1 ¶ 28. Local 95 is the exclusive collective bargaining representative for Head Start employees. Byington Aff. Ex. 2 at 2, ECF No. 94; *see also* Defs.' 56.1 ¶ 11; Pls.' 56.1 ¶ 11. The HSSBC is an employer association that acts as the collective bargaining agent for the Delegate Agencies. Defs.' 56.1 ¶ 15; Pls.' 56.1 ¶ 15.

The issue in this case is whether Defendants were obligated to pay the Fund for Head Start employees' hospitalization insurance. It is undisputed that the City did so for many years. *See* Defs.' Mem. at 1, ECF No. 76. Defendants, however, contend that when the City stopped covering the full amount of the insurance costs in 2009, it was within its rights to do so. *See id.* at 1–2.

---

[1] Unless otherwise noted, the following facts are undisputed.

[2] The City of New York is a municipal corporation and a subdivision of the State of New York. Defs.' 56.1 ¶ 1; Pls.' 56.1 ¶ 1. ACS is an agency of the City. Defs.' 56.1 ¶ 2; Pls.' 56.1 ¶ 2.

The hospitalization contract that covered Head Start employees during the relevant period was originally issued by Blue Cross and Blue Shield of Greater New York to the Day Care Council Local 205 D.C. 1707 Welfare Fund (the "Local 205 Fund") in 1978. Byington Aff. Ex. 15 ("BC/BS Contract"). The application for the policy indicated that the "Amount of Employer Contribution" for premiums would be 100%. *Id.* at FND-000505. On May 6, 1997, counsel for the Local 95 Fund wrote to ACS to discuss the possibility of taking over administration of the hospitalization coverage. Kane Decl. Ex. 16. The letter explained that the Local 205 Fund had been administering the coverage for "at least twenty years" and was "independently collect[ing] data regarding hires and terminations from each Head Start agency and report[ing] it to Blue Cross for billing." *Id.* The letter suggested that the Local 205 Fund had been performing this service "pursuant to a contract between the [Local 205 Fund] and the City." *Id.* A draft of the purported contract was attached to the letter. *Id.*; *see also* Kane Decl. Ex. 17 ("1979 Draft Contract").

The term of the draft contract was February 1, 1979 to January 31, 1980. 1979 Draft Contract ¶ 1. It contemplated that the City would pay for the Head Start employees' hospitalization premiums, and required the Local 205 Fund to reimburse the City for "[a]ll refunds or return of premiums paid or credited by Blue Cross." *Id.* ¶ 5. It made clear that "the source of the funds for the payments . . . [was] a federal grant to the City for the operation of Head Start programs," and capped the amount that the City would pay for premiums at $536,250. *Id.* ¶ 7(B). The draft contract also provided that the City would pay the lesser of 1.5% of the premiums paid or $8,045 to the Local 205 Fund each year as an administrative fee. *Id.* ¶ 4.

The May 6, 1997 letter stated that the draft contract was "the only one available." Kane Decl. Ex. 16. Thus, the Local 95 Fund asked ACS for "[a] copy of the latest hospitalization administration contract between the [Local 205 Fund] and ACS" as well as "[i]nformation

regarding the process through which the contract is renewed." *Id.* Despite this request, the parties agree that the Local 95 Fund never received "a single, integrated and executed hospitalization administration contract between the City and the Local 205 Fund," Pls.' 56.1 ¶ 62, and that there is no evidence that the 1979 draft contract was ever signed, Defs.' 56.1 ¶ 59; Pls.' 56.1 ¶ 59.

On July 31, 1997, Local 95 and the Local 95 Fund sent a letter to ACS jointly requesting that administration of the hospitalization coverage be "transferred" to the Local 95 Fund. Kane Decl. Ex. 19. On August 12, 1997, the HSSBC informed ACS that the subject of the potential transfer had been raised during "the most recent collective bargaining negotiations session" and that the HSSBC had not agreed to the transfer at the time. Kane Decl. Ex. 20. The HSSBC asked ACS to "hold the Union's request in abeyance" until the matter could be resolved through collective bargaining. *Id.* On August 26, 1997, ACS sent a letter to the HSSBC regarding "the recent request by the [Local 95 Fund] to transfer administration of the Head Start Blue Cross Hospitalization contract . . . from Local 205 to Local 95." Kane Decl. Ex. 21. ACS stated that it did "not have a problem with this request, and [was] prepared to approve it since payment for these benefits [was already going] to District Council 1707." *Id.* The letter made clear, however, that ACS would only instruct the City's Central Insurance Program to begin directing payments to the Local 95 Fund "upon receipt of [the HSSBC's] agreement." *Id.*

In January 1998, Local 95 and the HSSBC entered into a Tentative Memorandum of Agreement that provided that "the administration of the Blue Cross\Blue Shield coverage" would be transferred from the Local 205 Fund to the Local 95 Fund "as soon as practicable following the ratification of the 1996-2000 Agreement." Kane Decl. Ex. 22 ¶ 6. The transfer appears to have occurred sometime in the summer of 1998. *See* Kane Decl. Ex. 23. The Local 95 Fund took over administration of the hospitalization policy and assumed $2,804,387.19 in liabilities to ACS for

"reserves attributable to favorable claims experience the [Local 205 Fund] . . . accumulated during the length of the [Local 205 Fund's] administration of the Contract." *Id.*

In or around 1998, the City began directing payments for hospitalization premiums and an administrative fee of approximately 1.5% of the premiums to the Local 95 Fund. Defs.' 56.1 ¶ 73; Pls.' 56.1 ¶ 73. The City prepared annual "Contract Registrations" in connection with the payments it made to the Fund. *See, e.g.*, Kane Decl. Ex. 25 ("July 2007 Contract Registration"). Each Contract Registration was assigned a contract number, and Local 95 was described as a "vendor." *See, e.g.*, *id.* at NYC CUMMINGS 025275, 025277–81. The Contract Registrations certified that the "advice of award of contract" was made "in accordance with the provisions of the appropriate sections of the NYC Charter" and that the "award [was] a proper expenditure and the liability [was] charged to the proper fund or funds." *See, e.g.*, *id.* at NYC CUMMINGS 025281. The Contract Registrations also included memoranda prepared by the City indicating that the payments made to the Fund were "neither procurements nor subject to the [City's] Procurement Policy Board Rules." *See, e.g.*, *id.* at NYC CUMMINGS 025276. The Fund invoiced the City on a monthly basis, Defs.' 56.1 ¶ 75; Pls.' 56.1 ¶ 75; *see generally* Byington Aff. Ex. 36, and payment appears to have been made without incident for many years.

The Fund operated pursuant to the terms of its Trust Agreement, which was amended several times. Defs.' 56.1 ¶ 29; Pls.' 56.1 ¶ 29; *see generally* Trust Agreement. Under the 2003 amendments, which remained in effect throughout the relevant period, each "Employer" was required to "contribute to the Fund the amount required pursuant to the Collective Bargaining Agreement, and/or if applicable, Participation Agreement, under which it is covered at such time." Trust Agreement § 4.1.[3] The Trust Agreement defined "Employer" as "any Agency or Program

---

[3] All quotations from and citations to the Trust Agreement reflect the 2003 amendments.

that is obligated under the terms of a Collective Bargaining Agreement . . . to make contributions into this Fund on behalf of its Employees." *Id.* § 3.3.[4] In light of the fact that "the primary source of funding for the benefits provided by [the] Fund [was] the federal government," the Trust Agreement provided that "no Employer whose source of funds is a governmental agency shall be responsible for the failure to pay contributions to the Fund in a timely manner except as provided in Section 4.2." *Id.* § 4.6.[5] The Trust Agreement further provided that "[i]n the event that the disbursing governmental agency agrees to remit contributions directly to the Fund for an Employer, or through the [HSSBC] to the Fund for an Employer, such Employer shall not be responsible for the failure of the governmental agency to promptly remit funds." *Id.* The only signatories to the Agreement were the trustees, but the Agreement stated that "[a]ll contributing Employers . . . by making or agreeing to make contributions to the Fund . . . agree that [the Trust Agreement] governs the operation of the Fund and Plan to which they contribute." *Id.* § 2.5.

The City's contracts with the Delegate Agencies contemplated that ACS might obtain insurance on the Agencies' behalf. *See* Kane Decl. Ex. 12 ("Delegate Agency Contract") Pt. II, § 6.01(A) ("ACS may obtain an insurance package from the New York City Centralized Insurance Program . . . for the benefit of the Contractor and at the Contractor's expense . . . .").[6] In the event that ACS elected to obtain insurance, ACS would "retain funds, otherwise allocable to [the Delegate Agency] under [the contract] to purchase insurance for and on behalf of the [Delegate

---

[4] The Trust Agreement defined "Agency" as "a Head Start delegate agency that is covered by a Collective Bargaining Agreement." Trust Agreement § 3.11. The Trust Agreement defined "Program" as "a directly funded Head Start program or a Universal Pre-Kindergarten program that has entered into a Collective Bargaining Agreement." *Id.* § 3.13.

[5] Section 4.2 provided, in relevant part, that "[p]ayments of contributions, together with a report thereof, shall be made promptly, but not later than 10th [sic] day after an Employer which is funded by a governmental agency receives such payment." Trust Agreement § 4.2.

[6] This contract appears to be representative. *See* Defs.' 56.1 ¶¶ 19, 21–23; Pls.' 56.1 ¶¶ 19, 21–23.

Agency]." *Id.* § 6.01(C). Nevertheless, the contracts provided that "neither ACS nor the City [would] be liable for any obligations under any collective bargaining agreement that is negotiated and executed by the [HSSBC] or any other collective bargaining agent or the [Delegate Agency]." *Id.* § 5.03(B). A summary plan description from the relevant period stated that contributions into the Fund came not from Defendants, but rather "Head Start agencies whose employees are members of [Local 95], pursuant to the terms of a collective bargaining agreement." Kane Decl. Ex. 36 ("SPD") at FND-001134; *see also* Defs.' 56.1 ¶ 114; Pls.' 56.1 ¶ 114.

The trouble that gave rise to this case began in 2006. The federal government reduced the City's Head Start funding while Local 95 and the HSSBC were negotiating a new collective bargaining agreement ("CBA"). *See* Defs.' 56.1 ¶¶ 78–79; Pls.' 56.1 ¶¶ 78–79.[7] On June 26, 2006, ACS wrote a letter to the HSSBC to discuss health benefits for Head Start employees. Kane Decl. Ex. 27. The letter noted the rising cost of these benefits and advised the HSSBC that "it would be unwise to commit to expenditures beyond [January 2007] until we can be assured that we can meet the mandates established by the federal government." *Id.* On July 13, 2006, the HSSBC responded that it had "notified [Local 95] about the projected funding shortfall and its potential impact on money available to continue to fund health care benefits at its current level beyond [January 2007]." Kane Decl. Ex. 28.

In December 2006, the HSSBC and Local 95 entered into a CBA covering the period from February 1, 2005 through January 31, 2008 (the "2006 CBA") and a Memorandum of Understanding (the "2006 MOU"). Defs.' 56.1 ¶ 82; Pls.' 56.1 ¶ 82. The 2006 CBA provided, in relevant part, that "*the present health insurance program shall be continued*, except that the major

---

[7] Throughout the relevant period, Defendants were closely involved in the collective bargaining process. *See generally* Pls.' 56.1 ¶¶ 132–150; Defs.' Reply 56.1 ¶¶ 132–150, ECF No. 103. No CBA was considered final without their sign-off. *See* Pls.' 56.1 ¶ 143; Defs.' Reply 56.1 ¶ 143.

medical maximum benefit provided shall be increased from a $50,000 to a $500,000 lifetime benefit." Kane Decl. Ex. 9 ("2006 CBA") Art. XII, § 1 (emphasis added).[8] The 2006 MOU acknowledged that the HSSBC and Local 95 were aware "that due to a reduction in federal funding for Head Start, the health benefits as currently provided for in the CBA may be affected." *Id.* at 27. However, the parties agreed to postpone collective bargaining with respect to "revisions to the current health benefit terms of the new CBA" until it was "determined whether and what extent [sic] the current level of health benefits may be affected by [the] funding reduction." *Id.* at 28.

The federal Head Start funding was reduced again in 2007, and the City began incurring budgetary shortfalls for the Head Start program. Defs.' 56.1 ¶¶ 91–92; Pls.' 56.1 ¶¶ 91–92. These shortfalls persisted, and in early 2009, the City started underpaying the hospitalization premiums. *See* Defs.' 56.1 ¶¶ 98–100; Pls.' 56.1 ¶¶ 98–100, 130; Defs.' Reply 56.1 ¶ 130. In 2009 and 2010, ACS submitted applications to the federal government for supplemental funding. Pls.' 56.1 ¶ 168; Defs.' Reply 56.1 ¶ 168; *see generally* Byington Aff. Ex. 27. In these applications, ACS stated that it was covering all of the Delegate Agencies' health insurance costs and asserted that more funding was needed to pay for these benefits, which had already been negotiated through collective bargaining. Byington Aff. Ex. 27 at NYC CUMMINGS 037587, 051301, 056166. In November 2009, the Fund filed a lawsuit against the City in state court seeking recovery of the underpaid premiums. Defs.' 56.1 ¶ 101; Pls.' 56.1 ¶ 101.[9] Around the same time, the HSSBC and Local 95 entered into a Memorandum of Agreement extending the term of the 2006 CBA, which had expired on January 31, 2008, through January 31, 2011. Defs.' 56.1 ¶ 93; Pls.' 56.1 ¶ 93; Kane Decl. Ex.

---

[8] All prior Head Start CBAs also contained the phrase: "the present health insurance program shall be continued." Defs.' 56.1 ¶ 85; Pls.' 56.1 ¶ 85.

[9] The parties later stipulated to a dismissal of this action without prejudice. Kane Decl. Ex. 50.

30 ("2009 MOA"). Despite the City's ongoing underpayment of the premiums, the 2006 CBA's provisions regarding health insurance were left unchanged. *See generally* 2009 MOA.

The City continued to underpay the hospitalization premiums through September 2012. *See* Defs.' 56.1 ¶ 102; Pls.' 56.1 ¶¶ 102, 130; Defs.' Reply 56.1 ¶ 130. In or around February 2013, the HSSBC and Local 95 entered into a new CBA covering the period between February 1, 2012 and January 31, 2015 (the "2013 CBA"). Defs.' 56.1 ¶ 110; Pls.' 56.1 ¶ 110; Kane Decl. Ex. 34 ("2013 CBA").[10] The 2013 CBA stated that the City had "terminated the health insurance provided through its Central Insurance Program" and that "[a]ll health and supplemental benefits" would subsequently "be provided through [the Local 95 Fund]." 2013 CBA Art. XII, § 1. Defendants concede that the 2013 CBA "did not purport to change the [health insurance] structure in place prior to October 2012 retroactively." Defs.' 56.1 ¶ 111; *see also* 2013 CBA Art. XII, § 2(a) (providing for coverage under a new plan "[e]ffective October 1, 2012"). The total amount of underpayment between 2009 and 2012 is alleged to be approximately $15 million.

## STANDARD OF REVIEW

To prevail on a motion for summary judgment, the movant must show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "An issue of fact is genuine and material if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Cross Commerce Media, Inc. v. Collective, Inc.*, 841 F.3d 155, 162 (2d Cir. 2016). "The movant bears the burden of demonstrating the absence of a question of material fact." *Chaparro v. Kowalchyn*, No. 15-CV-1996 (PAE), 2017 WL 666113, at *3 (S.D.N.Y. Feb. 17, 2017). "When a motion for summary judgment is

---

[10] The parties agree that there does not appear to have been a CBA that covered the period between February 1, 2011 and January 31, 2012. Defs.' 56.1 ¶ 109; Pls.' 56.1 ¶ 109.

properly supported by documents or other evidentiary materials, the party opposing summary judgment may not merely rest on the allegations or denials of his pleading; rather his response, by affidavits or otherwise as provided in [Rule 56], must set forth specific facts demonstrating that there is a genuine issue for trial." *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009) (quotation marks omitted); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). In determining whether to grant summary judgment, the Court must "constru[e] the evidence in the light most favorable to the non-moving party and draw[ ] all reasonable inferences in its favor." *Mitchell v. City of New York*, 841 F.3d 72, 77 (2d Cir. 2016) (quotation marks omitted).

## DISCUSSION

The parties agree that Defendants did not pay the full amount of Head Start employees' hospitalization premiums between 2009 and 2012. The decisive question in this case is whether they were obligated to do so. Plaintiffs assert a claim under Section 515 of ERISA for delinquent contributions. They also assert state law claims for breach of contract, quantum meruit, and unjust enrichment. For the reasons that follow, the Court finds that there is no genuine dispute of material fact with respect to any of these claims and that Defendants are entitled to judgment as a matter of law. Plaintiffs' Section 515 claim is barred by Section 302(a) of the Labor Management Relations Act (the "LMRA"). Plaintiffs' state law claims are preempted by ERISA and the LMRA and foreclosed by the New York City Charter and the Rules of the City's Procurement Policy Board ("PPB"). Accordingly, the Court grants Defendants' motion for summary judgment.

## I.     Section 515 of ERISA

Plaintiffs' first claim is brought under Section 515 of ERISA, which provides that:

> [e]very employer who is obligated to make contributions to a multiemployer plan under the terms of the plan or under the terms of a collectively bargained agreement shall, to the extent not inconsistent with law, make such contributions in accordance with the terms and conditions of such plan or such agreement.

10

29 U.S.C. § 1145. Thus, to be liable under Section 515, a defendant must (1) have contribution obligations that arise from either a "plan" or a "collectively bargained agreement" and (2) be an "employer" within the meaning of ERISA. *Id.* Section 515 itself "does not impose a duty to make . . . contributions, even on one who qualifies as an 'employer' . . . if the duty to contribute did not previously exist." *Cement & Concrete Workers Dist. Council Welfare Fund v. Lollo*, 35 F.3d 29, 36–37 (2d Cir. 1994); *see also Laborers Health & Welfare Trust Fund for N. Cal. v. Advanced Lightweight Concrete Co.*, 484 U.S. 539, 549 n.16 (1988) ("[A]s written, § 515 plainly refers to obligations that themselves arise from either a 'plan' or a 'collectively bargained agreement.'").

Plaintiffs' Section 515 claim fails because Plaintiffs are unable to identify an enforceable contribution obligation that arose out of a plan or a CBA. No such obligation can be found in the terms of the plan. While a reasonable factfinder could conclude that the 2006 CBA obligated Defendants to cover the cost of hospitalization insurance, the language of the 2006 CBA is so ambiguous that any such obligation would violate Section 302(a) of the LMRA. This is fatal to Plaintiffs' Section 515 claim. Accordingly, the Court need not, and does not, reach the question of whether Defendants were "employers" within the meaning of ERISA.

## A.    The Plan

ERISA provides that "[e]very employee benefit plan shall be established and maintained pursuant to a written instrument." 29 U.S.C. § 1102(a)(1). "This written instrument requirement . . . 'serves two of the primary goals of ERISA: informing employees of the benefits to which they are entitled, and providing some degree of certainty in the administration of benefits.'" *Feifer v. Prudential Ins. Co. of Am.*, 306 F.3d 1202, 1208 (2d Cir. 2002) (quoting *Wentworth v. Digital Equip. Corp.*, 933 F. Supp. 123, 127 (D.N.H. 1996)); *see also Perreca v. Gluck*, 295 F.3d 215, 225 (2d Cir. 2002) ("The writing requirement protects employees from having their benefits eroded by

oral modifications to the plan." (quotation marks omitted)). A plan, however, need not be set forth in a single document. In fact, the Second Circuit recently suggested two types of documents that might contain plan terms: "(1) the governing plan document, *i.e.*, the trust agreement or contract under which the plan was formed; and (2) the summary plan description." *Silverman v. Teamsters Local 210 Affiliated Health & Ins. Fund*, 761 F.3d 277, 286 (2d Cir. 2014).

Neither of these documents can be read to impose contribution obligations on Defendants in this case. "Interpretation of the terms of an ERISA . . . plan is governed by the 'federal common law of rights and obligations under ERISA-regulated plans,'" *Aramony v. United Way of Am.*, 254 F.3d 403, 411 (2d Cir. 2001) (quoting *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 110 (1989)), and courts "interpret and enforce unambiguous language in an ERISA plan according to its plain meaning," *id.* at 412 (quotation marks omitted). The Trust Agreement did not impose any contribution obligations of its own. It required each "Employer" to "contribute to the Fund the amount required pursuant to the Collective Bargaining Agreement, and/or if applicable, Participation Agreement, under which it is covered at such time," Trust Agreement § 4.1, and defined "Employer" as "any Agency or Program that is obligated under the terms of a Collective Bargaining Agreement . . . to make contributions into this Fund on behalf of its Employees," *id.* § 3.3. The Trust Agreement contemplated that Defendants *could* "agree[ ] to remit contributions directly to the Fund for an Employer, or through the [HSSBC] to the Fund for an Employer," *id.* § 4.6, but it did not itself require that.[11] The only relevant language in a summary plan description that the parties identified stated that the plan was funded by "Head Start agencies whose employees

---

[11] There is no evidence that the 1979 draft contract was ever executed. Furthermore, by its own terms, it would have expired on January 31, 1980, and it would have limited the City's annual obligations to $536,250. *See* 1979 Draft Contract ¶¶ 1, 7(B). The City paid significantly more than $536,250 each year during the relevant period. *See* Defs.' 56.1 ¶ 53; Pls.' 56.1 ¶ 53.

are members of [Local 95], pursuant to the terms of a collective bargaining agreement." SPD at FND-001134; *see also* Defs.' 56.1 ¶ 114; Pls.' 56.1 ¶ 114. In other words, the contributions came from the Delegate Agencies, not from Defendants.

Plaintiffs argue that the Court should also look to the hospitalization contract and the premium notices and invoices provided to the City to determine the terms of the plan. Pls.' Opp. at 22, ECF No. 93; Oral Argument Tr. at 30:20–31:4, ECF No. 115. Plaintiffs note that the 1978 application for the hospitalization policy, which was incorporated into the contract, stated that the "Amount of Employer Contribution" for premiums would be 100%. *See* Pls.' Opp. at 22 (citing BC/BS Contract at FND-000505). They argue that this statement obligated Defendants to cover the cost of the policy premiums because "the City was the direct signatory employer" under the CBA in effect at the time of the application. *Id.* The Court must reject this argument. When the application is considered in the context of the contract as a whole, it cannot be reasonably read as requiring Defendants to make contributions to the Fund. *See Aramony*, 254 F.3d at 412 ("Language is ambiguous when it is capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement." (quotation marks omitted)). Plaintiffs have not identified any language elsewhere in the contract that purports to bind non-signatories or that suggests that the carrier was concerned with the manner in which contributions were made to the Fund. Defendants had no obligation to make premium payments to the carrier; both at the time of the application and during the relevant period, that was the plan's responsibility. *See* BC/BS Contract at FND-000432, 469. Furthermore, the contract expressly provided that "the statements made in [the application] shall be considered representations and not warranties." *Id.* at FND-000470. Thus, it does not appear that the parties to the contract even intended statements in the application to be contractually binding on one

another—let alone on Defendants, who were not signatories. *Cf. Jaspan v. Glover Bottled Gas Corp.*, 80 F.3d 38, 42 (2d Cir. 1996) (holding that an employer "did not bind itself to a liquidated damages provision contained in a governing trust agreement to which it never agreed" merely "by undertaking in a collective bargaining agreement to pay contributions to certain benefit funds").

Plaintiffs do not identify any language in the notices or invoices that purports to obligate Defendants to make contributions to the Fund. Rather, they appear to argue that the mere act of paying the premiums gave rise to an ongoing obligation. *See* Pls.' Opp. at 22. This argument fails. While Plaintiffs are correct that a plan "need not be a formal written document" and plan terms can, in some instances, be implicitly adopted, *Grimo v. Blue Cross/Blue Shield of Vt.*, 34 F.3d 148, 151 (2d Cir. 1994), course of conduct cannot supersede the written provisions of a plan, *see Feifer*, 306 F.3d at 1210 (holding that ERISA's written instrument requirement "essentially operates as a strong integration clause, statutorily inserted in every plan document" (quoting *Senior Exec. Benefit Plan Participants v. New Valley Corp.*, 39 F.3d 143, 149 (3d Cir. 1996))); *Perreca*, 295 F.3d at 225 (refusing to enforce an oral promise to modify the terms of an ERISA plan). Of course, the Trust Agreement contemplated that Defendants might "agree[ ] to remit contributions directly to the Fund for an Employer, or through the [HSSBC] to the Fund for an Employer." Trust Agreement § 4.6. However, to the extent Plaintiffs are suggesting that such an agreement can be implied from the "annual premium notices provided to and paid by the City," Pls.' Opp. at 22, the Court disagrees for two reasons. First, Defendants' payment of the premiums must be considered in the context of Defendants' contracts with the Delegate Agencies, which provided that ACS *could* obtain insurance on the Agencies' behalf, but was not required to do so. *See* Delegate Agency Contract Pt. II, §§ 5.03(B), 6.01. Second, as Plaintiffs themselves point out, Defendants never paid the full amounts of the premiums set forth in the notices that covered the relevant period.

The Fund notified Defendants of four premium increases between January 2009 and September 2012. Defs.' 56.1 ¶¶ 96, 104; Pls.' 56.1 ¶¶ 96, 104. The first invoice submitted pursuant to one of these notices was dated February 1, 2009. *See* Byington Aff. Ex. 36 at NYC CUMMINGS 033133. Defendants only partially paid that invoice, and they continued to underpay all subsequent invoices until the end of the relevant period. *See id.* at NYC CUMMINGS 033131; Defs.' 56.1 ¶ 102; Pls.' 56.1 ¶¶ 102, 130; Defs.' Reply 56.1 ¶ 130.

## B. The CBA

Plaintiffs' stronger, but ultimately unsuccessful, argument is that Defendants were obligated to make contributions under the terms of a CBA. The 2006 CBA, which was in effect during at least part of the relevant period, provided that "the present health insurance program shall be continued." 2006 CBA Art. XII, § 1; *see also* 2009 MOA (extending the term of the 2006 CBA through January 31, 2011). Plaintiffs contend that this language obligated Defendants to cover the cost of the hospitalization policy, as they had done for years leading up to the 2006 CBA.

### 1. The Meaning of the CBA's Language

As with plans, "[w]hen courts interpret CBAs, traditional rules of contract interpretation apply as long as they are consistent with federal labor policies." *Aeronautical Indus. Dist. Lodge 91 v. United Techs. Corp.*, 230 F.3d 569, 576 (2d Cir. 2000). Unambiguous provisions should be enforced as written. *Id.*; *see also Newspaper Guild/CWA of Albany v. Hearst Corp.*, 645 F.3d 527, 531 (2d Cir. 2011) ("[W]e conclude that the CBA is unambiguous and, thus, reliance upon extrinsic evidence is inappropriate."). "Only when provisions are ambiguous may courts look to extrinsic factors—such as bargaining history, past practices, and other provisions in the CBA—to interpret the language in question." *Aeronautical Indus. Dist. Lodge 91*, 230 F.3d at 576. Whether language "is clear or ambiguous is a question of law to be decided by the court." *Compagnie Financiere de*

*CIC et de L'Union Europeenne v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 232 F.3d 153, 158 (2d Cir. 2000). "[L]anguage is ambiguous if it is capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement." *Id.* (quotation marks omitted).

The Court finds the provision in question—"the present health insurance program shall be continued"—ambiguous. What was the "program" that the parties intended to continue? Was it the insurance policies themselves? Did it also encompass the source of funding? The 2006 CBA provides no answers to these questions.

Generally, "interpretation of ambiguous contract language is a question of fact to be resolved by the factfinder." *Id.* A court may only interpret ambiguous language as a matter of law where "the evidence presented about the parties' intended meaning is so one-sided that no reasonable person could decide the contrary." *3Com Corp. v. Banco do Brasil, S.A.*, 171 F.3d 739, 746–47 (2d Cir. 1999) (alteration omitted) (quoting *Boston Five Cents Sav. Bank v. Secretary of Dep't of Housing & Urban Dev.*, 768 F.2d 5, 8 (1st Cir. 1985) (Breyer, J.)). This evidence here is not so one-sided. While there is much in the record to suggest that the CBA was never intended to impose obligations on Defendants, a reasonable factfinder could conclude that the term "program" referred at least in part to the source of funding for hospitalization insurance. Defendants do not dispute that the City was providing such funding at the time of the 2006 CBA, nor that it had been for many years beforehand. In light of this, the Court cannot resolve this factual dispute in Defendants' favor on a motion for summary judgment.

## 2.    Defendants' Non-Signatory Status

The fact that Defendants were not signatories to the CBA is also not fatal to Plaintiffs' claim.[12]  While "[i]t goes without saying that a contract cannot bind a nonparty," *EEOC v. Waffle House, Inc.*, 534 U.S. 279, 294 (2002), it is an established principle of contract law that "[a] contract may be enforced against a non-signatory if the non-signatory has accepted the agreement and acted upon it," 28 Glen Banks, *New York Practice Series: New York Contract Law* § 19:5 (2d ed.); *see also Lerner v. Amalgamated Clothing & Textile Workers Union*, 938 F.2d 2, 5 (2d Cir. 1991) ("[S]tate law, 'if compatible with the purpose of § 301 [of the LMRA], may be resorted to in order to find the rule that will best effectuate the federal policy.'" (quoting *Textile Workers Union of Am. v. Lincoln Mills of Ala.*, 353 U.S. 448, 457 (1957))).  In *Brown v. C. Volante Corp.*, the Second Circuit held that an employer was bound by multiple CBAs that it never signed because its conduct, which included "contribut[ing] to [a fund] at the rate prescribed by the unsigned CBAs," "manifested an intent to adopt, or agree to, [the CBAs]."  194 F.3d 351, 355 (2d Cir. 1999); *see also Bricklayers Local 21 of Ill. Apprenticeship & Training Program v. Banner Restoration, Inc.*, 385 F.3d 761, 766 (7th Cir. 2004) ("We begin with the well-established principle that a collective bargaining agreement is not dependent on the reduction to writing of the parties' intention to be bound . . . rather all that is required is conduct manifesting an intention to abide and be bound by the terms of an agreement." (alteration and quotation marks omitted)).

A reasonable factfinder could conclude that Defendants' conduct in this case "manifested an intent to adopt, or agree to" the 2006 CBA and 2009 MOU. *Brown*, 194 F.3d at 355. Plaintiffs argue that the CBA required Defendants to pay for hospitalization insurance, and, as discussed,

---

[12] The 2006 CBA and 2009 MOU were agreements between the HSSBC and Local 95; Defendants were not signatories. *See generally* 2006 CBA; 2009 MOU.

the Court cannot reject that reading as a matter of law. The City was paying at least a portion of the hospitalization premiums before and after the 2006 CBA and 2009 MOU were executed. Defendants were also closely involved in the collective bargaining process and could veto any CBA. In 2009 and 2010, ACS submitted funding applications to the federal government stating that it was covering all of the Delegate Agencies' health insurance costs and that these benefits had already been negotiated through collective bargaining. Byington Aff. Ex. 27 at NYC CUMMINGS 037587, 051301, 056166. This conduct, considered together, could be construed as "accept[ing] the agreement and act[ing] upon it." Banks, *supra*, § 19:5.

In *Fishbein v. Miranda*, 670 F. Supp. 2d 264 (S.D.N.Y. 2009), the court reached the same conclusion on similar facts. There, two employee welfare benefit plans were obligated by the terms of CBAs "to accept funds from Contributing Employers and then to remit a certain percentage of such funds to Plaintiff UMMF [another plan]." *Id.* at 273. The two plans were not signatories to the CBAs. *Id.* at 272. The court nevertheless found that by complying with their obligations under the CBAs, the defendants could be found to have accepted the CBAs and acted upon them. *Id.* at 274. The case was appealed, and while the Second Circuit did not explicitly endorse the district court's conclusion, it did not cast doubt on it. *Silverman*, 761 F.3d at 286 ("Whether [the CBAs] contractually obligated the 210 Fund [one of the two employee welfare benefit plans], a non-signatory to the CBAs, to remit these funds to the UMM Fund is a question of contract law heavily litigated in the district court."); *see also Gesualdi v. Juda Constr., Ltd.*, No. 10-CV-1799 (RMB), 2011 WL 5075438, at *6–7 (S.D.N.Y. Oct. 25, 2011) (holding that an employer manifested an intent to be bound by a CBA where it submitted remittance reports to employee benefit plans and its parent company disclosed in a filing with the Securities and Exchange Commission that it was paying union benefit costs); *Impulse Mktg. Grp., Inc. v. Nat'l*

*Small Bus. All., Inc.*, No. 05-CV-7776 (KMK), 2007 WL 1701813, at *6 (S.D.N.Y. June 12, 2007) (holding that a non-signatory could be bound by a contract where it was alleged to have "micro-managed" the performance of the contract, "acknowledged that it was the actual party in interest," and made payments pursuant to the contract (quotation marks omitted)).[13] Thus, while the Court harbors doubts as to the merits of Plaintiffs' arguments regarding the meaning of the relevant language of the CBA and Defendants' manifestation of an intent to be bound by such language, these are factual issues that cannot be resolved in connection with this motion.

### 3. Section 302 of the LMRA

Nevertheless, an insuperable obstacle remains. Even if the language in the CBA means what Plaintiffs say it means, and even if Defendants manifested an intent to be bound by that language, the language is too vague to be enforced under Section 302(a) of the LMRA. It is for this reason that Plaintiffs' Section 515 claim fails as a matter of law.

"Section 302(a) of the LMRA makes it unlawful as a general matter for employers to provide payments to union affiliated representatives and entities, including union established ERISA funds, beyond narrowly prescribed exceptions set out in § 302(c)." *Trs. of Nat'l Automatic Sprinkler Indus. Pension Fund v. Fairfield Cty. Sprinkler Co.*, 243 F.3d 112, 116 (2d Cir. 2001).[14] Section 302(c)(5) permits contributions to ERISA funds under certain circumstances, but only if "the detailed basis on which such payments are to be made is specified in a written agreement with the employer." 29 U.S.C. § 186(c)(5)(B). In the absence of an agreement that complies with these

---

[13] On remand, the district court in *Silverman* adhered to its prior ruling that the funds could be bound despite their non-signatory status. *See Silverman v. Miranda*, 213 F. Supp. 3d 519, 525 (S.D.N.Y. 2016), *reconsideration denied*, No. 06-CV-13222 (ER), 2017 WL 1434411 (S.D.N.Y. Apr. 10, 2017).

[14] Under the LMRA, Defendants are not "employers." *See* 29 U.S.C. § 152(2) (excluding "any State or political subdivision thereof" from the definition of "employer"). However, Section 302(a) also applies to those "who act[ ] in the interest of an employer." 29 U.S.C. § 186(a).

requirements, recovery under Section 515 is not permitted. *Trs. of Nat'l Automatic Sprinkler Indus. Pension Fund*, 243 F.3d at 116–17 ("[R]ecovery . . . is precluded by § 302(a) unless one of the statutory exceptions provided by § 302(c) applies."); *see also Moglia v. Geoghegan*, 403 F.2d 110, 116 (2d Cir. 1968) ("[T]he only employer contributions which may be accepted by the trustees administering the fund are those contributions from employers who have a written agreement with the union as required by subsection 302(c)(5)(B).").

"The reason for the rigid structure of Section 302 is to insure that employer contributions are only for a proper purpose and to insure that the benefits from the established fund reach only the proper parties." *Moglia*, 403 F.2d at 116. The *Moglia* court was concerned that "[a]ny erosion of the strict requirements of this section could provide an unintended loophole for the unscrupulous, and could result in a diversion of funds away from the proper parties as had occurred before Section 302 was enacted." *Id.* In light of this concern, the requirements of Section 302(c)(5) are applied exactly. *Trs. of Nat'l Automatic Sprinkler Indus. Pension Fund*, 243 F.3d at 117. And although the "written agreement" required by Section 302(c)(5)(B) need not be a CBA, the "detailed basis" requirement must be satisfied. *See Guthart v. White*, 263 F.3d 1099, 1103 (9th Cir. 2001) ("Under the plain words of the statute, any written agreement with the employer can establish an employee's eligibility for Trust benefits, so long as it actually specifies, directly or by incorporation, 'the detailed basis' on which contributions are to be made."); *Cent. States Se. & Sw. Areas Pension Fund v. Kraftco, Inc.*, 799 F.2d 1098, 1111 n.16 (6th Cir. 1986) ("[I]t is clear that the written agreement required by § 302 need not be a collective bargaining agreement as long as it sets out the employer's obligation to contribute.").

Plaintiffs have failed to identify a written agreement that meets this requirement. The CBA provided that "the present health insurance program shall be continued." 2006 CBA Art. XII, § 1.

It cannot plausibly be maintained that this language specifies "the detailed basis on which [contributions] are to be made." 29 U.S.C. § 186(c)(5)(B). Nor can a "detailed basis" for contributions be found in the Trust Agreement. The Trust Agreement defined the uses and purpose of the Fund and the powers and duties of its trustees, and it imposed limitations on the use of monies paid into the Fund. *See generally* Trust Agreement Arts. 2, 7. It governed the timing of contributions and required a "report" to be made along with them. *Id.* § 4.2. It also recognized that "the primary source of funding for the benefits provided by [the] Fund [was] the federal government," and set forth special rules for contributions by employers "whose source of funds is a governmental agency." *Id.* § 4.6. It did not, however, set forth any contribution obligations independent of those that were provided for in the CBA. *See id.* § 4.1 (requiring each "Employer" to "contribute to the Fund the amount required pursuant to the Collective Bargaining Agreement . . . under which it is covered at such time"); *id.* § 3.3 (defining "Employer" as "any Agency or Program that is obligated under the terms of a Collective Bargaining Agreement . . . to make contributions into this Fund on behalf of its Employees"). In other words, the Trust Agreement itself looked to the CBA for the "basis" on which contributions were made.[15]

The Court is mindful of the policy against allowing employers to "invoke section 302 of the LMRA as a loophole through which to escape [contribution] obligations." *Bricklayers Local 21 of Ill. Apprenticeship & Training Program*, 385 F.3d at 772; *see also Nat'l Stabilization*

---

[15] Plaintiffs also argue that the hospitalization contract and the premium notices and invoices satisfy Section 302. *See* Oral Argument Tr. at 26:12–27:20. The Court disagrees. As discussed, the hospitalization contract cannot be read as imposing a contribution obligation. *See* Section I(A), *supra*. The same is true of the premium notices and invoices. While some courts have suggested that "remittance reports" and "payroll sheets" can fulfill the requirements of Section 302(c)(5), *see, e.g., Trs. of Int'l Bhd. of Teamsters Local 531 Sick & Welfare Fund v. Marangi Bros., Inc.*, 289 F. Supp. 2d 455, 463 (S.D.N.Y. 2003) (citing *Masters, Mates & Pilots Pension Plan v. Lowen*, 161 F.3d 2 (4th Cir. 1998)), the plain language of the statute requires not just a writing, but a "written agreement," 29 U.S.C. § 186(c)(5)(B). Because Defendants never fully paid the premiums set forth in the notices and invoices applicable to the relevant period, they and the Delegate Agencies cannot be said to have agreed to them. *See* Section I(A), *supra*.

*Agreement of Sheet Metal Indus. Trust Fund v. Commercial Roofing & Sheet Metal*, 655 F.2d

1218, 1226 (D.C. Cir. 1981) ("[W]here possible, courts have acted to restrain section 302(c)(5)

violations without disturbing the employer's payment obligations."). Nevertheless, the

requirements of Section 302(c)(5)(B) must be strictly applied. *Trs. of Nat'l Automatic Sprinkler*

*Indus. Pension Fund*, 243 F.3d at 117. The CBA is simply not sufficiently detailed; it does not

specify which entity is required to make contributions, to which entity the contributions should be

paid, or the amount of such contributions. Any manner or amount of payment could be justified

under such language, which makes it tantamount to no writing at all. Although, like in *Moglia*,

this "construction of Section 302 may work a hardship . . . especially as [Plaintiffs have not]

engaged in any wrongful conduct," the Court considers its construction "the only acceptable one

in light of the congressional history and intent." *Moglia*, 403 F.2d at 116.

## II.     State Law Claims

Plaintiffs also assert state law claims for breach of contract, quantum meruit, and unjust

enrichment. These claims are preempted by ERISA and the LMRA and foreclosed by the New

York City Charter and the City's PPB Rules.[16]

### A.     Preemption

With certain exceptions, ERISA preempts "any and all State laws insofar as they may now

or hereafter relate to any employee benefit plan" covered by ERISA. 29 U.S.C. § 1144(a). "A

law 'relates to' an employee benefit plan . . . if it has a connection with or reference to such a

plan." *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 96–97 (1983). ERISA's "expansive pre-emption

---

[16] Plaintiffs' claims for quantum meruit and unjust enrichment were asserted for the first time in
their opposition brief. It is well-settled that "it is inappropriate to raise new claims for the first time in
submissions in opposition to summary judgment." *Beckman v. U.S. Postal Serv.*, 79 F. Supp. 2d 394, 407
(S.D.N.Y. 2000) (quotation marks omitted). Nevertheless, the Court will address these claims in connection
with this motion because they are barred for reasons that have already been adequately briefed.

provisions [were] intended to ensure that employee benefit plan regulation would be 'exclusively a federal concern.'" *Aetna Health Inc. v. Davila*, 542 U.S. 200, 208 (2004) (citation omitted) (quoting *Alessi v. Raybestos-Manhattan, Inc.*, 451 U.S. 504, 523 (1981)). When considering preemption, courts "begin with the assumption that 'Congress does not intend to supplant state law,' a presumption that is particularly strong for 'state action in fields of traditional state regulation.'" *Gerosa v. Savasta & Co.*, 329 F.3d 317, 323–24 (2d Cir. 2003) (citation omitted) (quoting *N.Y. State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 654–55 (1995)). However, "any state-law cause of action that duplicates, supplements, or supplants the ERISA civil enforcement remedy conflicts with the clear congressional intent to make the ERISA remedy exclusive and is therefore pre-empted." *Davila*, 542 U.S. at 209.

Any breach of contract claim based on Defendants' alleged failure to make contributions pursuant to the terms of the plan or the CBA would "duplicate[ ], supplement[ ], or supplant[ ] the . . . civil enforcement remedy" set forth in Section 502(a)(3) of ERISA. This provision allows "participant[s], beneficiar[ies], or fiduciar[ies]" to bring civil actions "(A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan." 29 U.S.C. § 1132(a)(3). It is the statutory mechanism for enforcing compliance with Section 515 and the jurisdictional basis for this lawsuit. Because Congress intended to make the remedy set forth in Section 502(a)(3) exclusive, Plaintiffs cannot supplement it with state law claims that are premised on breaches of plan documents or the CBA. *See Davila*, 542 U.S. at 209. The fact that the Court has concluded that Plaintiffs cannot proceed under Section 515 is immaterial. *See Romney v. Lin*, 105 F.3d 806, 808, 813 (2d Cir. 1997) (holding that a state law claim seeking "to collect . . . delinquent contributions" was preempted by

ERISA "even though it is directed against a defendant not liable under ERISA"); *De Pace v. Matsushita Elec. Corp. of Am.*, 257 F. Supp. 2d 543, 572 (E.D.N.Y. 2003) (observing that "ERISA's preemptive reach is broader than its remedial provisions").

Plaintiffs have also asserted implied contract and quasi-contract claims. *See* Pls.' Opp. at 24–30. Even if these additional claims do not exactly replicate Section 502(a)(3), they too are preempted because they are, at bottom, attempts "to collect . . . delinquent contributions." *Romney*, 105 F.3d at 808 (rejecting attempt to collect unpaid contributions from shareholder of an employer under a New York statute). Plaintiffs contend that Defendants had contribution obligations that arose independently of the plan and the CBA, but this notion is antithetical to Congress's goal of ensuring "that plans and plan sponsors would be subject to a uniform body of benefits law." *Travelers*, 514 U.S. at 656 (quoting *Ingersoll-Rand Co. v. McClendon*, 498 U.S. 133, 142 (1990)). "Section 515 of ERISA sets forth those parties who are liable for contributions to ERISA funds." *Plumbing Indus. Bd., Plumbing Local Union No. 1 v. L & L Masons, Inc.*, 927 F. Supp. 645, 649 (S.D.N.Y. 1996), *aff'd sub nom. Plumbing Indus. Bd., Plumbing Local Union No. 1 v. E.W. Howell Co.*, 126 F.3d 61 (2d Cir. 1997). Despite Plaintiffs' assertion that "the Fund is just a City vendor, like many others," Pls.' Opp. at 31, Plaintiffs' state law claims would imply contribution obligations through state law separate and apart from Section 515. Not only would this undermine the uniformity that Congress sought to impose through ERISA, it would frustrate ERISA's written instrument requirement and Section 302 of the LMRA. *See* Section I(A), (B)(3), *supra*. Plaintiffs' ERISA claim has failed as a matter of law, and Plaintiffs cannot rely on state law to provide a remedy that ERISA will not. *See Cent. States, Se. & Sw. Areas Health & Welfare Fund v. Gerber Life Ins. Co.*, 771 F.3d 150, 154 (2d Cir. 2014) ("Litigants are not at liberty to plead around

ERISA's limitations by resorting to common law . . . claims."); *E.W. Howell Co.*, 126 F.3d at 68 ("A state is not free to designate new obligors for an employer's ERISA obligations.").

Any contract claim based on a breach of the CBA would also be preempted by the LMRA.[17] "Section 301 [of the LMRA] governs claims founded directly on rights created by collective-bargaining agreements, and also claims 'substantially dependent on analysis of a collective-bargaining agreement.'" *Caterpillar, Inc. v. Williams*, 482 U.S. 386, 394 (1987) (quoting *Int'l Bhd. of Elec. Workers v. Hechler*, 481 U.S. 851, 859 n.3 (1987)). "[I]f the resolution of a state-law claim depends upon the meaning of a collective-bargaining agreement, the application of state law . . . is pre-empted and federal labor-law principles . . . must be employed to resolve the dispute." *Lingle v. Norge Div. of Magic Chef, Inc.*, 486 U.S. 399, 405–06 (1988). A claim for breach of a CBA falls squarely within the ambit of Section 301. *See Silverman v. Miranda*, 116 F. Supp. 3d 289, 310 (S.D.N.Y. 2015) (holding that state law claims based on an alleged breach of CBAs were preempted by the LMRA); *Jacobson v. Televida, Inc.*, No. 04-CV-0163 (SLT), 2005 WL 3609101, at *8 (E.D.N.Y. Aug. 10, 2005) (holding that a state law claim based on an alleged breach of a CBA's contribution requirements was preempted by ERISA and the LMRA).

## B. New York City Charter and PPB Rules

Even if the Court agreed with Plaintiffs that "the Fund is just a City vendor," their state law claims would fail as a matter of law. The New York City Charter provides that any contract for services for which funds are "to be paid . . . out of the city treasury or out of moneys under the control of" the City must meet strict requirements. N.Y.C. Charter § 310(1). In general, any such

---

[17] In a letter dated February 7, 2017, Plaintiffs sought, for the first time in this action, to assert a claim under Section 301 of the LMRA. However, a Section 301 claim would fail for the same reasons as Plaintiffs' Section 515 claim. *See* Section I(B)(3), *supra*. Even if Plaintiffs' reading of the CBA is correct, a contribution obligation that fails to comply with Section 302(a) of the LMRA is unenforceable. *See generally Kaiser Steel Corp. v. Mullins*, 455 U.S. 72 (1982).

contract must be in writing and approved as to form by the Corporation Counsel, and a copy of the contract must be filed with and registered by the City Comptroller. *See id.* §§ 311, 328, 394(b); 9 R.C.N.Y. §§ 1-01, 1-02(a), 2-12. Plaintiffs do not argue that there is a contract in this case that meets these requirements. This is fatal to both their contract and quasi-contract claims, at least to the extent they are seeking to recover as a "vendor."

A contract that does not satisfy the requirements of the New York City Charter and the PPB Rules is "not a final and legally binding contract." *Casa Wales Hous. Dev. Fund Corp. v. City of New York*, 11 N.Y.S.3d 31, 32 (1st Dep't 2015) (affirming dismissal of "contractual, and noncontractual-based causes of action, including [a] claim of promissory estoppel" where "the contract at issue never met the requirements of the Procurement Policy Board and Chapter 13 of the New York City Charter"), *leave to appeal denied*, 26 N.Y.3d 917 (2016); *see also Granada Bldgs., Inc. v. City of Kingston*, 58 N.Y.2d 705, 708 (1982) ("Municipal contracts which violate express statutory provisions are invalid."). And "[e]ven though a promise to pay may be spelled out from the parties' conduct, a contract between them may not be implied to provide 'rough justice' and fasten liability on the State when applicable [law] expressly prohibit[s] it." *Parsa v. New York*, 64 N.Y.2d 143, 147 (1984). However harsh this may seem, "any other rule would completely frustrate [procurement laws] designed to protect the public from governmental misconduct or improvidence." *Id.*; *see also Seif v. City of Long Beach*, 286 N.Y. 382, 387 (1941) ("Where the Legislature provides that valid contracts may be made only by specified officers or boards and in specified manner, no implied contract to pay for benefits furnished by a person under an agreement which is invalid because it fails to comply with statutory restrictions and inhibitions can create an obligation or liability of the city."); *Lutzken v. City of Rochester*, 184 N.Y.S.2d 483, 487 (4th Dep't 1959) ("Although other jurisdictions may recognize a claim upon a quantum meruit

or quantum valebant, even though there were irregularities or defects in the method of contracting for the services, it is clear that such is not the law in this State.").

Plaintiffs argue that this precedent is irrelevant because the City's procurement requirements are not applicable to this case. *See* Pls.' Opp. at 26–27. According to Plaintiffs, this is so for two reasons. *See id.* First, Plaintiffs note that the Contract Registrations that the City prepared in connection with its payments to the Fund included memoranda that stated that the payments were "neither procurements nor subject to the PPB Rules." *Id.* at 26 (alteration omitted). They argue that this precludes Defendants from relying on the PPB Rules as a defense in this case. *Id.* Second, Plaintiffs argue that ACS should not be considered a municipal agency in its capacity as Head Start grantee, and thus that it cannot rely on the PPB Rules. *Id.* at 26–27.

Both arguments are meritless. First, based on the language in the Contract Registration memoranda, the City believed that payments to the Fund were not "procurements." July 2007 Contract Registration at NYC CUMMINGS 025276.[18] It logically followed that the payments were not "subject to the [City's] Procurement Policy Board Rules." *Id.* Here, at least in connection with their state law claims, Plaintiffs are arguing that the payments *were* procurements. *See* Pls.' Opp. at 31 (arguing that "the Fund is just a City vendor, like many others"). Nothing in the Contract Registrations bars Defendants from arguing that the PPB Rules apply to procurements.

Plaintiffs' second argument—that ACS should not be considered a municipal agency in its capacity as Head Start grantee—relies primarily on *Meriden Community Action Agency v. Shalala*, 827 F. Supp. 54 (D.D.C. 1993). In that case, the court observed, in a very different context, that

---

[18] "Procurement" is defined as "[b]uying, purchasing, renting, leasing, or otherwise acquiring any goods, services, or construction." 9 R.C.N.Y. § 1-01. "It also includes all functions that pertain to the obtaining of any good, service, or construction, including planning, description of requirements, solicitation and selection of sources, preparation and award of contract, and all phases of contract administration, including receipt and acceptance, evaluation of performance, and final payment." *Id.*

cities are not eligible to be Head Start grantees under federal law. *See id.* at 55. Based on this, Plaintiffs reason that ACS, as a Head Start grantee, must not be a municipal agency. *See* Pls.' Opp. at 26. Plaintiffs, however, have waived this argument by admitting that ACS is a municipal agency. Defs.' 56.1 ¶ 2; Pls.' 56.1 ¶ 2. Even if they had not, they do not cite any authority for the proposition that federal law regarding Head Start eligibility overrides local procurement rules, and the Court is aware of none.[19] Thus, to the extent Plaintiffs seek to characterize the Fund as a "vendor," their state law claims are barred by the New York City Charter and the PPB Rules.

## CONCLUSION

Defendants' motion for summary judgment is granted. The Clerk of Court is directed to terminate the motion pending at Docket Number 69 and enter judgment in favor of Defendants.

SO ORDERED.

Dated:     September 29, 2017
           New York, New York

Ronnie Abrams
United States District Judge

---

[19] The Court also notes that the court in *Meriden* expressly vacated its ruling with respect to cities' eligibility to be Head Start grantees. *Meriden Cmty. Action Agency v. Shalala*, No. 93-CV-1251 (SS), 1993 WL 391091, at *1 (D.D.C. Sept. 20, 1993).